UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREVILLION WARD,<br><br>   Plaintiff,<br><br> v.<br><br>CRAIG KOENIG,<br><br>   Defendant. | Case No. 21-cv-09741-JST<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO COMPEL; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 54, 56 |

Plaintiff has filed this *pro se* civil rights action against former Correctional Training Facility ("CTF") warden Craig Koenig. Now pending before the Court are (1) Plaintiff's motion to compel, ECF No. 54; and (2) Defendant's motion for summary judgment, ECF No. 56. For the reasons set forth below, the Court DENIES Plaintiff's motion to compel, ECF No. 54; and GRANTS Defendant's motion for summary judgment, ECF No. 56.

## BACKGROUND

### I. Complaint

The operative complaint makes the following relevant factual allegations. During the relevant time period, Plaintiff was housed at Correctional Training Facility ("CTF"), and defendant Koenig was CTF warden. By July 20, 2020, defendant Koenig was aware that COVID-19 was a serious health risk to staff and inmates; that the number of staff and inmate COVID-19 infections was rising; and that containing the potential spread of COVID-19 within CTF required social distancing, minimizing inmate movement, and the use of masks, protective gear, and gloves. Despite this knowledge, defendant Koenig authorized a raid on July 20, 2020, referred to as Operation Akili, which targeted African American inmates in CTF D-Wing, either with the intent to intentionally infect African American inmates with COVID-19, or with knowledge of,

but without concern for, the high likelihood that that the raid would spread COVID-19 among the inmates targeted by the raid. The officers carrying out the raid were both masked and unmasked, and inmates heard the officers state they didn't care about COVID-19. The raid involved correctional officers rousing inmates from their beds at 3:30 a.m., assaulting inmates, and forcing inmates to stand outside their housing unit without face masks. Some of the inmates, including inmate Lawrence Brown, were taken to interrogation rooms and insulted over a period of eight hours, before being returned to their housing units.

Prior to Operation Akili, there were no COVID-19 cases in CTF-Central. ECF No. 57 at 11. At the time of Operation Akili, Plaintiff was housed in G-Wing, which is on the other side of CTF from D-Wing. Plaintiff was not involved in Operation Akili. Dkt. No. 24 at 19.

Inmate Brown contracted COVID-19 approximately ten days after Operation Akili. Soon thereafter, COVID-19 spread to two other inmates in D-Wing, with one of the inmates dying from COVID-19 on August 20, 2020. By October 2020, COVID-19 had spread from D-Wing into C, B, E, F, and G-Wings. On November 17, 2020, Plaintiff, who had been housed in G-Wing during the relevant events, tested positive for COVID-19 and ultimately contracted COVID-19-related pneumonia. On March 2, 2022, Plaintiff contracted COVID-19 again. Plaintiff continues to suffer long-term effects from his COVID-19 infections. His lung capacity is permanently reduced; his pre-existing medical conditions—cirrhosis of the liver, prediabetes, obesity, arthritis, mobility impairment, and other issues—have been significantly aggravated by the two COVID-19 infections; and he requires ADA accommodation to perform simple tasks. The operative complaint seeks the following relief: a release order, a transfer order,[1] a declaratory finding of defendant Koenig's liability, damages, and civil penalties. *See generally* ECF No. 24. The Court previously found that these factual allegations stated cognizable claims for violation of the Eighth Amendment's prohibition on deliberate indifference to an inmate's serious medical needs and safety; and cognizable claims for the state law torts of intentional infliction of emotional distress and negligent supervision. *See generally* ECF No. 29.

---

[1] The requests for release from custody in a CDCR facility and for transfer to a different facility are moot as Plaintiff has been released from prison. ECF No. 38

## II. Operation Akili

Plaintiff argues that Operation Akili targeted "a hapless population of Black prisoners asleep in their cells" either with the intent to either intentionally infect them with COVID-19, or done knowingly that there was a high likelihood that that the raid would spread COVID-19 among the inmates targeted by the raid. ECF No. 24 at 6-7, 16; ECF No. 57 at 8. Plaintiff argues that it is impossible that Operation Akili was launched to gather information regarding the potential threat of violence posed by the Black Guerilla Family ("BGF") against the Aryan Brotherhood for the following reasons. The BGF has been defunct since the 1980s and any remaining BGF members would not be a threat to prison security because they would be 60-80 years old and no longer active gang members, as older men tend to age out of gangs. The younger generation of prisoners would never be considered an actual BGF OG or an active BGF member. The Black inmates targeted in Operation Akili were between 30 to 50 years of age, and any remaining BGF members are older than that. The only active Black prison gangs are the Crips and the Bloods. Subsequent to the 2012 peace treaty Agreement to End All Hostilities ("AEAH"), all prison gangs except the Fresno Bulldogs have been at peace. In particular, there has been no conflict between Blacks or any other groups. In a Bay Area News Group interview published in 2024, a high ranking leader of the Aryan Brotherhood, Ronald Dean Yandell, stated in court and to the media that the Aryan Brotherhood had an intra-gang peace treaty that had saved countless lives, and that the government had responded to the treaty by trying to create division between the prisoners. Modified programming was imposed on inmates affiliated with the two active Hispanic gangs, the Bulldogs and Surenos, but the prison did not deem it necessary to separate Black and White inmates, proving that Black and White inmates were not in conflict.

Defendant Koenig states that Operation Akili was initiated in response to his request to the Office of Correctional Safety for assistance with an intelligence gathering operation related to a potential threat of violence by the Black Guerilla Family against the Aryan Brotherhood. ECF No. 56-1 at 3. Operation Akili was initiated to identify and document incarcerated individuals who were promoting and/or engaging in prison gang behavior, as well as to validate any incarcerated individuals who met the criteria for being designated prison gang affiliates. ECF No. 56-1 at 3.

3

**DISCUSSION**

**I.     Motion to Compel (ECF No. 54)**

Plaintiff has filed a motion to compel Defendants to adequately answer his second set of interrogatories. ECF No. 54. The Court DENIES this motion without prejudice because it lacks the necessary certification that Plaintiff has conferred in good faith with Defendant in an effort to obtain the requested discovery without court action, as required by Fed. R. Civ. P. 37 and N.D. Cal. L. R. 37-1(a). Fed. R. Civ. P. 37(a)(1) requires that a motion to compel discovery "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). N.D. Cal. L.R. 37-1(a) provides that the Court will not entertain a request or a motion to resolve a discovery dispute unless, pursuant to Fed. R. Civ. P. 37, counsel have previously conferred for the purpose of attempting to resolve all disputed issues. N.D. Cal. L. R. 37-1(a).

**II.    Summary Judgment Motion (ECF No. 56)**

    **A.     Legal Standard**

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings

4

1    and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on
2    file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324
3    (citing Fed. R. Civ. P. 56(e)). "A scintilla of evidence or evidence that is merely colorable or not
4    significantly probative does not present a genuine issue of material fact" precluding summary
5    judgment." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

6         For purposes of summary judgment, the court must view the evidence in the light most
7    favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *AXIS*
8    *Reinsurance Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 844 (9th Cir. 2020). If, as to any
9    given material fact, evidence produced by the moving party conflicts with evidence produced by
10   the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving
11   party with respect to that material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).
12   However, facts must be viewed in the light most favorable to the nonmoving party only if there is
13   a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The court's
14   function on a summary judgment motion is not to make credibility determinations or weigh
15   conflicting evidence. *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

16       **B.**    **Analysis**
17           **1.**    **Eighth Amendment Claim**

18        Defendant Koenig argues that he is entitled to summary judgment on the Eighth
19   Amendment claim because there is no evidence that Operation Akili caused Plaintiff's November
20   2020 COVID-19 infection. In support of this argument, Defendant notes that the Court has
21   previously rejected nearly identical claims – that the July 2020 Operation Akili was the proximate
22   cause of November 2020 COVID-19 infections – in *Milton v. CDCR*, C No. 23-cv-0582 JST, 2024
23   WL 1772847, at *2 (N.D. Cal. Apr. 23, 2024), and *Adams v. CDCR*, C No. 21-cv-8545 JST, 2023
24   WL 7165845, at *3 (N.D. Cal. Octo. 30, 2023). Defendant argues that it is highly improbable that
25   Plaintiff contracted COVID-19 in November 2020 based on an event that occurred in July 2020
26   because both the WHO and the CDC have recognized that fourteen days is the maximum
27   incubation period for the virus that causes COVID-19, and that the probability that an exposure
28   will develop into a COVID-19 infection only decreases further as more time elapses. *See*

1    *generally* ECF No. 56 at 10-11; ECF No. 62 at 2-3.

2    In his opposition, Plaintiff argues Defendant is not entitled to summary judgment on the
3    Eighth Amendment claim because there is evidence that Operation Akili was launched with the
4    purpose of causing Black inmates to contract COVID-19, and with the knowledge that it would
5    cause a COVID-19 outbreak throughout CTF, including Plaintiff's eventual infection.  In support
6    of this argument, Plaintiff provides declarations from inmates involved in the raid, alleging that,
7    during the raid, correctional officers made racist comments and stated that they didn't care about
8    COVID-19 and hoped that the Black inmates would catch COVID-19.  ECF No. 24 at 14-16.
9    Plaintiff argues that Operation Akili could not have been conducted in response to information
10   regarding a potential threat of violence by the Black Guerilla Family against the Aryan
11   Brotherhood because the BGF is no longer active and because Black and White inmates did not
12   have conflict pursuant to a peace treaty in effect at that time, as evinced by the fact that modified
13   programming was instituted to keep Hispanic gang members separated, but Black and White
14   inmates were allowed to program together. ECF No. 57 at 6-7.  Plaintiff argues Defendant
15   misleadingly emphasizes COVID-19's 14-day incubation period when the relevant issue is disease
16   contagion, or how contagious viruses, including COVID-19, spread.  Plaintiff argues that the
17   following "contract tracing" establishes that Operation Akili was "the causal event" of his
18   COVID-19 infection.  Prior to Operation Akili, there were no COVID-19 cases in CTF-Central.
19   Operation Akili was "an inherently dangerous operation" likely to spread COVID-19 because it
20   was conducted at the height of the COVID-19 pandemic; did not involve the proper health
21   precautions, such having staff and inmates masked and socially distanced; and was in
22   contravention of CDCR protocols intended to prevent the spread of COVID-19, such as
23   minimizing inmate movement.  On July 20, 2020, during Operation Akili, inmate Brown was
24   taken from his housing unit to an interrogation room, and interrogated for eight hours before he
25   was allowed to return to his housing unit.  Inmate Brown contracted COVID-19 approximately ten
26   days later.  Soon thereafter, two other D-Wing inmates, neither of whom were directly involved in
27   the raid, contracted COVID-19, showing that Operation Akili caused inmates not affected by the
28   raid to contract COVID-19.  COVID-19 is known to be a contagious disease that spreads easily in

1    prisons, especially prisons that are overcrowded, unsanitary, and poorly ventilated, as is the case

2    for CTF; and that contagious diseases are transmitted and spread by contact with infected

3    individuals, infected bodily discharges, airborne microbes such as respiratory droplets, and

4    contaminated surfaces. By October 2020, COVID-19 had spread from D-Wing into C, B, E, F,

5    and G-Wings. On November 17, 2020, Plaintiff tested positive for COVID-19 and ultimately

6    contracted COVID-19 related pneumonia. ECF No. 24 at 16-20; ECF No. 57 at 10-14.

7    The Court GRANTS summary judgment in favor of defendant Koeing on the Eighth

8    Amendment claim because, viewing the record in the light most favorable to Plaintiff, Plaintiff has

9    failed to demonstrate a triable issue of material fact as to whether Operation Akili, and not some

10   other source, was the proximate cause of his November 2020 COVID-19 infection.

11   In *Adams* and *Milton*, the Court dismissed Eighth Amendment claims that were factually

12   similar to Plaintiff's claim. In *Adams*, all the prisoner-plaintiffs were present during Operation

13   Akili. However, two of the prisoner-plaintiffs, inmates Brinkley and Adams, did not contract

14   COVID-19 until November 2020. The Court dismissed inmates Brinkley and Adams because the

15   operative complaint did not provide sufficient factual content to demonstrate that their November

16   2020 COVID-19 infections were caused by the July 2020 Operation Akili, and not by one of the

17   many other potential sources of that disease. The Court found that the operative complaint's

18   general allegations regarding the weather, the unique pathway of each COVID-19 infection, and

19   how COVID-19 spread wing-by-wing through CTF before reaching G-Wing in October 2020

20   were insufficient to plead causation. *Adams*, 2023 WL 7165845, at *3. In *Milton*, fifty inmates

21   sued regarding injuries arising from Operation Akili. Three of these inmates – inmates Milton,

22   Clark and Pardue – were not present during Operation Akili, but claimed to have contracted

23   COVID-19 as a result of Operation Akili. Inmate Milton contracted COVID-19 in late November

24   or early December 2020. Inmate Clark contracted COVID-19 on August 7, 2020, seventeen days

25   after Operation Akili. Inmate Clark was housed two cells across and over from inmate Lawrence

26   Brown who was involved in Operation Akili and tested positive for COVID-19 nine days after the

27   raid. The Court dismissed inmates Milton and Clark from *Milton* for failure to plausibly allege

28   that Operation Akili, and not some other source, caused their COVID-19 infection. The Court

found that inmate Pardue had plausibly alleged that he had contracted COVID-19 from Operation Akili because he contracted COVID-19 within ten days of Operation Akili, and he may have contracted the virus from his cellmate, inmate Patterson, who was taken from his cell and interrogated during Operation Akili.

Similar to inmates Brinkley and Adams in *Adams*, and inmate Milton in *Milton*, Plaintiff contracted COVID-19 months after Operation Akili. In support of his claim that Operation Akili was the proximate cause of his November 2020 COVID-19 infection, Plaintiff makes general allegations about how contagious diseases spread, how CTF conditions facilitated the spread of COVID-19, how Operation Akili likely caused CTF's first COVID-19 cases. The Court accepts these allegations as true for the purposes of this summary judgment motion, but none of these allegations demonstrate that Operation Akili, and not some other source, caused Plaintiff's COVID-19 infection. Accordingly, there is no triable issue of material fact that Operation Akili caused Plaintiff's November 2020 COVID-19 infection.

### 2. **Qualified Immunity**

Defendant Koenig argues that he is entitled to qualified immunity because it would not have been clear to an official in his position that authorizing Operation Akili would be constitutionally problematic. ECF No. 56 at 11-12. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In considering a claim of qualified immunity, the Court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

8

addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Because Plaintiff has not shown a violation of his constitutional rights, as explained above, there is no necessity for further inquiry concerning qualified immunity. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

### 3. State Law Claims

The Court GRANTS summary judgment in favor of Defendant on Plaintiff's state-law claims of intentional infliction of emotional distress and negligent supervision. The basis for both these claims is Plaintiff's claim that Operation Akili caused his COVID-19 infection. As discussed above, Plaintiff has not demonstrated that Operation Akili, and not some other source, caused Plaintiff's COVID-19 infection. The elements of a claim for intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intent to cause, or reckless disregard for the probability of causing, emotional distress; (2) suffering of severe or extreme emotional distress by the plaintiff; and (3) that the plaintiff's emotional distress is actually and proximately the result of the defendant's outrageous conduct. *Conley v. Roman Catholic Archbishop of San Francisco*, 85 Cal.App.4th 1126, 1133 (Cal. Ct. App. 2000). The elements of a negligent supervision claim are (1) the existence of a legal duty to use reasonable care; (2) the breach of that duty; (3) proximate cause between the breach and (4) the plaintiff's injury; and (5) where the facts that the employer knew or should have known created a particular risk or hazard, and that particular harm materialized. *Brown v. City of Clovis*, C No. 119-CV-00465 LJO-SAB, 2019 WL 3231734, at *8 (E.D. Cal. July 18, 2019) (citing to *Mendoza v. City of Los Angeles*, 66 Cal.App.4th 1333, 1339 (Cal. Ct. App. 1998) and *Doe v. Capital Cities*, 50 Cal.App.4th 1038 (Cal. Ct. App. 1996)). Plaintiff alleges that defendant Koenig's authorization of Operation Akili constituted extreme and outrageous conduct and a breach of Defendant's legal duty towards Plaintiff. However, because Plaintiff has not demonstrated that Operation Akili was the actual or proximate cause of his contracting COVID-19 and any related injuries or emotional distress, Plaintiff's state-law claims of intentional infliction of emotional distress and negligent

supervision fail as a matter of law.

#### 4. Punitive Damages

Because the Court has granted summary judgment in favor of Defendant on the merits of this action, the Court declines to address Defendant's argument regarding punitive damages.

### CONCLUSION

For the reasons set forth above, the Court DENIES without prejudice Plaintiff's motion to compel, ECF No. 54, and GRANTS Defendant's summary judgment motion, ECF No.56. Judgment is entered in favor of Defendant and against Plaintiff. The Clerk shall terminate all pending motions as moot and close the case.

**IT IS SO ORDERED.**

Dated: March 31, 2025



JON S. TIGAR
United States District Judge